and is in good standing with the highest court of Virginia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Those are the magic words that have to be stated officially. I would just add, as a very, very brief personal gloss, Scott is my law clerk. He's done an excellent job working with me this year, and I know that he will be, if my motion is granted, an excellent addition to the bar of the court. I move his admission. Well, thank you. We shall see. We can take a vote. Do I hear you? Yes. I vote to grant, and I would vote to grant. The motion is granted. Please proceed to the clerk. I take the oath. Mr. Allen, welcome to the bar of this court. We look forward to seeing you before the bench in the future. The argued case this morning is No. 15, C5005, Stillwell against the Department of Health and Human Services. Mr. Adjaman. Mr. Adjaman, I'd like to make one inquiry, if I could, before I start arguing, and it relates to the appendix. Please proceed to the podium so that your comment can be recorded. I noticed last week that one page was missing from the appendix. It has to do, it's the first page of the Brighton Group report, which is page 300. I bought copies, page 600, I bought copies, if that's necessary, of that first page that's missing, and I just wanted to direct your attention to that fact. All right, thank you. Now, please send it to us. Pardon? If there's anything else that we need, please provide it to the court. I can provide it, yes. Okay, thank you. Thank you. Please proceed. Yes, Your Honor. In the Stillwell case, I believe there are four factors that we really ought to examine. Although the factors are not independent from one another, there would be a starting point. The first factor is what is a variant disease process and an atypical disease process. The second is the burden of proof that's required in a vaccine case. The third is the application of the more likely than not standard of proof, as opposed to something of a higher standard. Judge Knott, one of the arguments you make, and I think you probably just alluded to it without naming it, is it's your contention, as I understand it, that the special master erred in following the Breckelsen-Lombardi approach. That's correct. Could you really elaborate on that a bit? I'm not sure I quite understand what the basis for your objection to that is. Well, that obviously goes to the heart of the question, and it's rather complex. The question becomes, we know that the special master is supposed to review in detail the whole, to draw plausible inferences from it, and then to elicit a rational decision. Now, the problem is that if there's a conflict in the record, the conflict that created here was not in the record. It was in the testimony of the government's expert witness. So, the question is, what can be considered with reference to the government's expert witness in determining whether the applicant has, or the petitioner, has established a prima facie case? What it seemed to me, as I understand it here, it was your contention, the Stilwell's contention, that she was afflicted with ADEM as a result of the influenza vaccination she received. That's correct. As I understand it, it was the government's position that no, she did not develop ADEM. Rather, she had some unspecified demyelinating condition. That's correct. So, I guess why wasn't, under those circumstances, why wasn't it appropriate for the special master to go the Breckelson-Lombardi route and make a determination as to whether she had the malady about which she complained? Well, this goes to the issue of what is a variant disease process, a typical disease process. And Lombardi involved two totally different disease processes that the special master had to focus in on. And he had trouble in doing that, in agreeing to that one, that specific one that the applicant was alleging. So, he had a division there. Now, that's not the case here. We know what the disease process was. It was a lesion in the brain, in the midbrain, in the Pons area of the midbrain. So, now we've got a situation where we know what the disease process, and it's just a matter of categorizing it. Medically, you categorize a disease process for purposes of treatment and prognosis, and not for purposes of determining causation, which is a legal standard. Now, we get into more likely the not standard, as opposed to the medical diagnosis standard, which is a much higher standard. The problem in applying Lombardi here is when you have a variant in a disease process, which we did here, because it involved an adult and not a children. This is the prevailing types of cases that occur in ADM are primarily children. So, when you get an adult, you've got a variant or an atypical. But, it's known that adults will develop ADM. And, the fact that it was a child versus an adult disease has nothing to do with the case. We know adults got it. They got it. Now, the question becomes, how do you apply all of this to a prima facie case? So, you're saying it's your position, and I want to make sure I understand, that it was error for the judge to use the Breckels and Lombardi approach because ADM is a variation or a subset of a demyelinating disease. And, it's your position that in that kind of a circumstance, the Breckels and approach isn't appropriate. Is that your view? That is correct. I just don't understand what it was. Because, when you apply the ADM approach, you're, in effect, incorporating any variant of the ADM approach into the decision-making process, the medical decision-making process. Are there any other questions on that? No. That answers my question. Okay. Okay. Yeah. You know, I started to talk about the variant type of diseases. And, when you have an adult, you've got a variant from the prevailing characteristics of the disease process, which is primarily children. And, once you get that variant, you now have a situation where you've got a person, an adult versus a child who has a developing brain. You're going to have different reactions, and that was the testimony of Dr. Kinsborn in our case. So, that goes to the variant disease process. We come to the issue of the more likely than not standard prima facie. How do we determine what's the prima facie case in which the government witness testimony can be considered by the special master? You know, there are three types of evidence. There are evidentiary facts, ultimate facts, and also there's conclusions that you reach from those facts, right? As to evidentiary facts, then, in a prima facie case, the government should be able to contest any evidentiary facts, particular evidentiary fact, that the appellant is, or because that's an error, and then he should testify as to what that error is and the effect of the area. When you get into ultimate facts, you get into a little bit different situation because there are being conclusions reached or inferences reached from those facts. In this case, what would you, give me an example of what you would say is an evidentiary fact on the one hand and an ultimate fact on the other. Sure. In this case, for example, there was a lesion. There's no question there was a lesion on the brain. That's an evidentiary fact. That's an evidentiary fact. And the ultimate fact would be, what is that a manifestation of? Right. Exactly. Exactly. And then from that, you go into whatever the conclusion is going to be with respect to the disease process, right? Now, to contest the conclusions of the, by itself, of the witness, of the respondents, appellant's witness, excuse me, to contest that testimony simply by saying your conclusion is wrong. Well, my gosh, you're opening the door now to all kinds of litigation because when you have an atypical or a variant disease process, there's always going to be differences of opinion. Well, isn't that what the special master is there to resolve, though? Pardon? Isn't that what the special master is there to resolve? That's a factual question. No. No, not, because if you're going to allow that kind of evidence in on a normal case, not like the Lombardi or the Brookenshine cases. If you're going to allow that in, you're opening up the litigation into a total litigation as you have in a civil trial, and that's not what the, I'm not quite understanding what you're saying. Go ahead. Is it your contention, then, that once you introduce evidence of causation that the government isn't allowed to contest that? Well, what I'm talking about, all we had here in this case was an expert witness on the part of the government who was contesting whether this condition was ADM based upon his personal experience, and that personal experience was not even supported by the medical literature that he... But again, isn't that a question for the special master? No. I'm arguing no, because... Can I finish my question, please? Oh, I'm sorry. Why, I mean, whether somebody is a competent expert or not is usually a question... Absolutely. ...to the ponder... Absolutely. ...which is the special master. I agree. I agree. So I don't understand why... I mean, you disagree, obviously, with the government's expert. Right. But that's a question generally left to the prior fact. If it's a question of evidentiary fact, yes. If it's a question of ultimate fact, yes. What happened here is, which is more important in this case, I believe, is the fact that the special master is supposed to review the record as a whole, reach possible inferences from the record, and then rendering a rational articulation of the decision. All right? What they're supposed to do is first review the medical record, and then go through the process, and they reach a decision for the medical record. What happened here is that the special master adopted the testimony of the government's expert witness, and then sought evidence in the record to support that decision. That's not the way the process is supposed to go. When you turn it upside down like that, you get into a real problem. But I think what you're... Yes. What you would have to show, or what you're asking us to accept, is that in the absence of any evidence other than the fact that the symptoms appeared within a couple of months after the inoculation... No. The actual onset of the disease process, and there was no dispute as to that, was within the 42 days of the criteria for an onset of the disease process. What happened was the special master went to the IOM, and this is an illustration of what I'm talking about, went to the IOM report, the Institute of Medicine report, went to a particular paragraph extracted from that one paragraph, one sentence, that could have been interpreted to mean that it was a shorter period than 42 days on the onset. But then again, the next paragraph specifically concluded that the 42-day onset period was a proper onset period. Now, that's inexplicable. What she was trying to do at that point is to support Dr. Cohen's testimony. And the medical literature that was all cited, cited a period of Dr. Cohen's testimony was between, I think, 10 days to two weeks. But Dr. Cohen's testimony wasn't even supported by his medical literature or other medical literature. So that's an indication. That's one indication. Respectfully, one thing. You had said that the special master, simply after the fact, looked for reasons to support the Cohen analysis. That's correct. But in fact, if you look at Dr. Cohen's report, his June 25, 2011 report, the items that he relied on, the special master relied on, those six points that were critical for him, are basically set forth in the Cohen report of June 25. That's correct. Let me address those points. I don't think it's correct to say that the special master came to a conclusion or just backed up the Cohen report, backed up Dr. Cohen, and then kind of looked for reasons in the Cohen report. If I might, I'm sorry for interrupting, but my time is running out. No, I understand. And I want to address very quickly those six factors. I mean, one of the factors was the statistical probability. But you do agree, before you address it, but you do agree that they were cited by Dr. Cohen. Oh, yes. Yeah, they weren't just manufactured by the special master. Oh, no, no, no, no, no. I'm not indicating that at all. But look at the first factor of the six factors. It was that this was a statistical, or one of them, it was a statistical probability that it was going to be incurred by a child rather than an adult. I mean, I don't understand that reason. I find it mind-boggling. That's like saying that a vaccine won't cause an injury because it's not likely to cause an injury. The second factor that she relied on, and that was from Dr. Cohen. Isn't it a relative point when you have here the patient, a 53-year-old woman who received the vaccine, and she's complaining about ADEM, whereas the literature suggests that 90%, 97% of the people who are afflicted with ADEM are children? That's correct. I mean, that seems to me to be a reasonable thing to consider. The fact that an adult didn't get the disease when it's known that an adult gets the disease. One other factor that I can speak of real quickly, and that is the decision that because no other physician diagnosed this condition, that this is evidence that she didn't have the condition. Well, for Pete's sakes, if the physicians had actually considered ADEM and excluded it, that certainly would be relevant evidence, but they didn't diagnose any classification of that particular disease process. They didn't diagnose nothing. The only thing they considered at one point was MS, and as to that MS, they excluded it. So, there was no classification. Let's hear from the government. We'll save some rebuttal time. Okay, thank you. Ms. Babcock. Good morning. May it please the Court, my name is Alexis Babcock, and I represent the Secretary of Health and Human Services. This is a case where the Chief Special Master, then Chief Special Master, considered the relevant evidence in the record as a whole, drew plausible inferences, and articulated a rational basis for her decision. The Court of Federal Claims, after considering the evidence, affirmed the Special Master's decision, and we request that this panel does the same. I think a brief sketch of facts, which we've alluded to before, is important to understand. There was a vaccination on February 22nd. More than two months later, the petitioner showed up at the doctor, reporting some vague symptoms, which at the time were actually diagnosed as an ear infection, and over the following several months, other symptoms appeared. It was very unclear. The treating physicians weren't sure what was going on. MRIs were normal. And then eventually, her symptoms were worse in August, and then they sort of developed over the following year or so. I think it's critical in this case that not a single treating physician diagnosed her with ADEM, which was the alleged injury, because her symptoms were not consistent with ADEM. And this is, in fact, what the Special Master considered in conducting her analysis on the case. As Your Honors probably noticed, the first 20 pages of Appellate's brief, and most of the argument today, has really focused on an effort to re-litigate the case in this forum. And we'd respectfully say that the Special Master did consider the evidence as a whole, and her decision here should not be disturbed. There was nothing arbitrary and capricious about the weighing of the evidence in the case. But do you know what's troubling about this? Is that there's no other explanation. The only thing that happened was the inoculation. Well, respectfully, Your Honor, it's not clear. The inoculation was more than two months before she had an ear infection. So there's really no evidence at all that there's any link to what happened to her and the vaccination at any point. And more importantly, Petitioner's allegation here was that she had ADEM, which is a very specific neurological condition with very specific characteristics, and that was really the focus of the evidence presented in the case in the literature that the Special Master considered. So if there's no evidence that the vaccination caused her condition, then there was no way for the Special Master to make the finding that she was entitled to compensation. She simply looked at the overall evidence in the case. But in this entire body of law, the reason that we have stable injuries and a lot of the rest of it is because of the difficulty of tracing causation from vaccinations. There are all sorts of ailments. That's really how this entire statute is based, to somehow try and cross this difficulty, this medical difficulty of causation. Absolutely. There is scientific evidence that vaccinations do cause some injuries afterwards. But as this court's precedent clearly says, simply because something happens at some period in time after a vaccination doesn't mean that it's necessarily linked to it. And by chance alone, there are many, many conditions which are idiopathic or we just don't know what the cause was. But the law is not necessarily, is it? It's more likely than not? It is more likely than not. Or at least possibly, I think it's quite permissive just because of the difficulties of proof. We would submit that the burden is more likely than not. It's more than possible. It needs to be probable. But the special master did consider whether there was any link between petitioner's condition here and her vaccination, and she found in weighing the evidence and the literature and the testimony, and in a fairly exhaustive way, that there just wasn't any link. And we think that that weighing of the evidence was not arbitrary and capricious in this case. If I understand, the government would correct me if I'm wrong. I'm reading the briefs. It's my sense that the government says, okay, demyelinating denotes a type of malady or affliction as a general umbrella that affects the nervous system. Under that umbrella, we have certain specific afflictions. There's ADEM. There's multiple sclerosis. Then there can be just something that is categorized as demyelinating because it impacts the nerve endings, whatever. And I guess it's the government's position that, if anything, the record shows that it was this latter type of condition that may be at work here in Ms. Stilwell's condition rather than ADEM, which is a specific subset like multiple sclerosis. Is that the government's position, Viv? I think that's absolutely correct. I'll note, though, that in this case, it's not even 100% clear that she had a demyelinating issue. The treaters, it was sort of a differential diagnosis because they knew a lesion was there and they knew that she had had spinal fluid testing, which they actually suspected maybe she had multiple sclerosis for a period of time. And fibromyalgia was talked about. And fibromyalgia, which is, again, a completely different injury with different etiologies. And I think what's important and the reason that it needs to be narrowed down from sort of a broader umbrella is different neurological conditions underneath that umbrella have different timing of onset. You know, you can have, for something like multiple sclerosis, a medically accepted timeframe might be a little bit longer than for something like ADEM, which is typically within one to two weeks of whatever the inciting agent is, if it is. And so that's really critical to a special master doing a causation analysis. And more importantly, the allegation was specifically that she had ADEM here. And so the special master looked at, well, what is the evidence that's been presented? What is the literature that's here? What's the testimony of the experts? And found that she didn't have it. And she considered the medical records, which no single treater diagnosed with ADEM. No one even treated her as if she had ADEM, because there's a typical, there's a medical, a medication course that's typically administered with ADEM. And it's just not here, because they didn't ultimately, the special master found, and I think it was an error for her to do so, that there's just no evidence that she had it in this case. And I'm... Let's go back to what we were talking about. You said more likely than not. I don't think that's the standard. I think the standard for this statute is that if it's possible, nobody said it's impossible. If it's possible, when there's no other cause, no other intervening is unknown, there's still a lot the medical science doesn't know, that the statute is supposed to come into effect. Is that your understanding? I think I would respectfully disagree with you, Your Honor. I think that the Alton criteria in particular, which articulate there is a plausible medical theory, but then there is a logical sequence of cause and effect, I think it's something more than just possible. And I believe this Court has addressed that it needs to be more than just possible. But here there was no other theory, as I recall. No other causation, no postulate, no competing diagnosis. In this case? Correct. We did not say that something else caused her condition, whatever it is characterized. We're just pretty sure it's not ADEM. But the Special Master was evaluating whether the petitioner had established her burden and establishing more likely than not that the vaccine caused the injury here, and she ultimately held that the petitioner did not. And therefore, she was not entitled to compensation. Your corrector was not an alternate cause here, but we would submit there doesn't have to be an alternate cause. Simply because a vaccine occurred at some point in time before an injury occurs doesn't necessarily mean that the vaccine is the cause for that. If it's the only difference, the only thing that's happened, why doesn't it meet even the higher standard for a non-table injury? I think because it's essentially the position is that you have to have some evidence that it's by something more than chance alone. If I have a flu vaccine and next week I'm in a car accident, the flu vaccine was not the cause of my car accident. And I realize I'm grossly oversimplifying, but I think, or if I have a flu vaccine and then I get a really, you know, I get a horrible upper respiratory infection, so there's been something administered into my body, it doesn't necessarily mean that the upper respiratory infection, which I had afterwards, is the cause of the flu vaccine. But you're really changing the facts right at the point of difference. Because here, as I recall, there was nothing intervening. More than two months elapsed, also. She received a flu vaccine in February. This is not my field, but I think that a two-month gestation period for something as dramatic as multiple sclerosis may not be unusual. That takes years, does it not? Well, she doesn't have multiple sclerosis. Well, or the symptoms. Diseases don't happen overnight. They actually happen, and as when I, in response to Judge Shaw earlier, their ADEM is typically within one to two weeks. It's a short period of time. Multiple sclerosis can sometimes be a little bit longer, but again, it's clear. They considered MS as a diagnosis here and rejected it. She does not meet the diagnostic criteria. They ultimately did not think that that's what she had. They also didn't think she had ADEM. But you're looking at, you know, that's why it's important to focus on what the specific allegation is, and it does. Part of what this special master's evaluation here was, what does the science say about the appropriate onset for this particular medical condition? And she looked at the IOM report. She looked at the other literature that had been submitted, and then she made a decision that the judge didn't support. Well, as a threshold matter, that it didn't have, that she didn't have ADEM, but she also did consider if it would have been an appropriate timeframe and found that it was not. There were some questions when Mr. Agilat was up about whether it was error for the chief social master to rely on Lombardi and Brokelshins. As I sort of touched on already, I think absolutely not. It's what the actual injury is, is critical to an evaluation, even under the all-time prongs or the causation prongs in the case. You have to understand what they're alleging has happened in order to determine whether there's a medical theory like different, you know, molecular mimicry might be a theoretical cause for one neurologic injury, but it's not for another neurologic injury. And even under a broad demyelinating umbrella, like you were asking about before, Your Honor, there's, you have to, you have to understand a more specific injury in order to articulate a mechanism by which it must be caused and articulate whether that's a plausible mechanism. So, the special master rightly made her initial inquiry whether the petitioner had ADEM in the case and found that she did not. And there was, Mr. Agilat argued in his brief and then before you today that it was error somehow for the special master to consider Dr. Cohen's testimony, but we'd submit that it's absolutely not error. I mean, the government, like any other defendant, as this court said in de Besson, is allowed to present evidence to rebut petitioner's case when they're establishing the prima facie case. So, petitioners are saying one thing, but the government can bring evidence in to say here's why that's not a logical sequence of cause and effect. It's part of the evaluation of petitioner's case in its chief, and it absolutely is. Otherwise, the special master is essentially evaluating a case with blinders on, which would make no sense, and has certainly come in in subsequent cases, I believe, that de Besson and then also in Stone and Hammett, where panels here have emphasized that, of course, it's fine for the government to bring that evidence in as necessary. Ultimately, this court should give great deference to the special master's determinations. She considered the evidence through plausible inferences and articulated a record that's clear upon review. Unless you have any other questions, I would request that this... ...question? ...question. Thank you. Mr. Archulette, you have three minutes. I'll touch on a couple points. One, the decision of the special master, as I understood it, was that the six criteria were out of the outer limits of ADEM, but they were within the criteria of ADEM. When she does that, she's rendering a medical diagnosis. The other credentials, other conditions, which Your Honor brought up. There was no other condition that was specified. The only condition that was specified as to a classification was ADEM. There can't be an inference that it was somewhere else, because that's what all of the evidence is. Finally, the... I don't know what else to say, but there's something else. The condition... Oh, the problem we get here is that if you're going to open up the door to a physician coming in and saying, hey, I disagree with appellant's testimony, simply on the conclusion of what the classification was here, you're undermining the entire Vaccine Injury Act and the approach that it's taking, as well as the appellant test, which requires that once a primacasia phase is established, it switches now the burden onto the respondent to prove that it was some other factor. Here we have simply testimony based upon expert witnesses, the government expert witnesses experience with children when he says it's 97%. There was nothing that established that in his testimony other than... I mean, any of the records other than in his testimony. So he has experience with 97% of his patients being children, and that's what he's testifying to. However, my gosh, if you allow that kind of testimony, as I say, you're simply undermining the Vaccine Injury Act in establishing a primacasia case. Unless you have a question, I don't know what else to say. Thank you. Thank you. Thank you both. Thank you. Case is taken under submission. All rise.